IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

NATHAN JOSEPH DONLAN,
     Plaintiff,

vs.                       Case No.: 3:17cv452/EMT

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,
     Defendant.
_____/

## MEMORANDUM DECISION AND ORDER

This case has been referred to the undersigned magistrate judge for disposition pursuant to the authority of 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, based on the parties' consent to magistrate judge jurisdiction (*see* ECF Nos. 8, 9). It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act"), for review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed.

I.    PROCEDURAL HISTORY

On March 24, 2014, Plaintiff filed an application for SSI, and in the application he alleged disability beginning on August 10, 2012 (tr. 23).[1]  His application was denied initially and on reconsideration, and thereafter he requested a hearing before an administrative law judge ("ALJ").  A hearing was held on April 20, 2016, and on July 7, 2016, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 23–35).  The Appeals Council subsequently denied Plaintiff's request for review.  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007).  This appeal followed.

II.   FINDINGS OF THE ALJ

In denying Plaintiff's claims, the ALJ made the following relevant findings (see tr. 23–35):

(1)    Plaintiff did not engage in substantial gainful activity after March 24, 2014, the date he applied for SSI;

---

[1] All references to "tr." refer to the transcript of Social Security Administration record filed on September 25, 2017 (ECF No. 12).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system or any other page numbers that may appear.

Case No.: 3:17cv452/EMT

(2)     During the relevant period,[2] Plaintiff had the following severe impairments: cervical and lumbar degenerative disc disease, headaches, depressive disorder, anxiety disorder, and personality disorder;

(3)     Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4)     Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 416.967(b), except he could never climb ladders, ropes, or scaffolds.  He could occasionally stoop; frequently crouch, kneel, or crawl; and frequently handle objects with the right hand.  He was to avoid all exposure to open moving machinery and unprotected heights.  He was limited to routine repetitive tasks and was to be employed in a low stress job that required only occasional decision-making, and he could have only occasional interaction with the public, co-workers, and supervisors;

(5)     Plaintiff was unable to perform any past relevant work;

(6)     Plaintiff was born on March 5, 1978, and was 36 years of age, which is defined as a younger individual aged between 18 and 49, on the date he applied for SSI;

(7)     Plaintiff has at least a high school education and is able to communicate in English;

(8)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff was "not disabled," whether or not he had transferable job skills;

---

[2] The relevant period is from March 24, 2014 (the date Plaintiff applied for SSI), through July 7, 2016 (the date the ALJ issued his decision), even though Plaintiff alleges disability as of August 10, 2012 (*see* tr. 23).  *See* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005) (indicating that SSI claimant becomes eligible to receive benefits in the first month in which he is both disabled and has an SSI application on file).

Case No.: 3:17cv452/EMT

(9)     Considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed;

(10)     Plaintiff therefore was not under a disability, as defined in the Act between March 24, 2014, the date he applied for SSI, and July 7, 2016, the date the ALJ issued his decision.

III.     STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g);

Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy." *Id*. § 423(d)(2)(A). Pursuant to 20 C.F.R. § 404.1520(a)–(g),[3] the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his RFC and vocational factors, he is not disabled.

_____

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks disability insurance benefits ("DIB") or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416). Therefore, citations in this Order should be considered to refer to the appropriate parallel provision. The same applies to citations of statutes or regulations found in quoted court decisions.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL AND MEDICAL HISTORY[4]

A.    Relevant Personal History

Plaintiff was thirty-six years of age on the alleged onset date (tr. 33). He has past work experience as an insurance claims representative, police aide, telemarketer, and skip trace worker (tr. 33, 132, 266).

B.    Relevant Medical History

Evidence That Predates the Relevant Period

---

[4] Because the issues in this appeal relate to Plaintiff's mental impairments, the court's summary of the evidence will primarily focus on the same. Moreover, the court largely relies on the evidence identified by the parties, as they were directed to specifically identify those parts of the record that support their factual contentions and claims (see ECF No. 13).

The file contains treatment records from psychiatrist Michael P. Conrad, M.D., dating back to October of 2010, long before the commencement of the relevant period in March of 2014.[5]  Dr. Conrad's treatment notes show that Plaintiff received outpatient treatment about eight times a year in the form of twenty-minute "supportive psychotherapy [sessions] with medication evaluation" and medication management (*see, e.g.*, tr. 461).  At varying times between late 2010 and early September of 2013, Dr. Conrad assessed Plaintiff with one or more of the following impairments:  major depressive disorder, somatoform disorder, anxiety, and obsessive-compulsive disorder (*see, e.g.*, tr. 441–61); and he prescribed Plaintiff one or more of the following medications:  Inderal, Valium, Paxil, Abilify, propranolol, Seroquel, and Xanax (*id.*).

On September 19, 2013, Plaintiff was hospitalized for four days after intentionally cutting his arm (tr. 440).  Plaintiff reportedly did this on an impulse because he was upset with his parents; he regretted it immediately (*id.*).  Dr. Conrad saw Plaintiff after his discharge.  He assessed major depressive disorder and obsessive-compulsive disorder and continued Plaintiff's medications (*id.*).

On October 31, 2013, Plaintiff was admitted to the West Florida Hospital after attempting suicide by overdosing on butalbital (tr. 364).  Plaintiff reported symptoms of depressed mood, hopelessness, helplessness, poor energy, poor self-esteem, and

---

[5] As the ALJ observed, Dr. Conrad actually began treating Plaintiff in 1992 (*see* tr. 30; *see also* tr. 542), when Plaintiff was approximately fourteen years of age.

chronic and episodic suicidal thoughts (*id*.). Plaintiff also reported rage episodes which were worse when he was taking Seroquel, as well as general difficulty functioning (tr. 371). Stephen L. Curtis, M.D., initially observed Plaintiff to present a risk to himself due to suicide ideation and self-abusive behavior; Dr. Curtis also noted that Plaintiff's "compliance with medications [was] unclear" (*id*.). Dr. Curtis assessed bipolar disorder with depressed mood, probable mixed personality disorder with borderline and histrionic features, and chronic pain (tr. 364). After concluding that Plaintiff did not meet the criteria to be committed under the Baker Act, Dr. Curtis discharged Plaintiff on November 4, 2013 (*id*.). When Plaintiff returned to Dr. Conrad, on November 12, 2013, he advised that he had not tried to hurt or kill himself on October 31 but instead was "simply trying to escape and . . . doing a little bit as retribution towards anger towards his mother" after his mother called the police and attempted to commit him under the Baker Act (tr. 438).

The remaining treatment records of Dr. Conrad, through March 18, 2014, are generally the same as before, reflecting twenty-minute psychotherapy sessions and medication evaluation and management, although Dr. Conrad prescribed different medications for Plaintiff during this time frame, such as Deplin, metoprolol, lithium, and Viibryd (*see* tr. 436–39). Of note, on March 18, 2014, Dr. Conrad expressed a concern about his ability to continue treating Plaintiff because he was not sure he

could trust Plaintiff to take his medications in the manner they had been prescribed to him, in part because Plaintiff had previously presented to his office in an impaired state (tr. 436, 435).[6]

<u>Evidence from the Relevant Period (March 24, 2014, to July 7, 2016)</u>

Plaintiff returned to Dr. Conrad on April 1, 2014 (tr. 435). He did not appear to be impaired, although he evidently was "accidentally" tapering off the Viibryd, against Dr. Conrad's intentions (*id.*). Otherwise, the treatment record is generally the same as before. On May 5, 2014, Plaintiff reported that he thought the lithium had been helping "a little bit" (tr. 576).

On May 14, 2014, Dr. Conrad completed a "Treating Source Mental Status Report" (tr. 540). The report is handwritten, and portions of it are difficult to decipher. It appears that Dr. Conrad described Plaintiff's mood as depressed and "unmotivational [sic]" and his affect as incongruent (*id.*). Dr. Conrad appears to have noted that Plaintiff's mood was inappropriately bright at times and that Plaintiff was

---

[6] Earlier treatment records from Dr. Conrad indicate that Plaintiff was not taking his medications as prescribed (*see, e.g.*, tr. 446 (noting that Plaintiff was still taking Cogentin even though Dr. Conrad had given him "specific orders to stop taking it"), tr. 445 (Dr. Conrad expressing a concern that he "was not sure what medicines [Plaintiff] was taking because [Plaintiff] went back and forth on what he was taking and then was very unclear," prompting Dr. Conrad to write down the prescribed medications on a sheet of paper and provide the list to Plaintiff, with a copy for the file); tr. 444 (Dr. Conrad emphasizing to Plaintiff the need to take his medications exactly as prescribed and noting a report by Plaintiff's father that he also suspected Plaintiff was not taking the medications correctly, although Plaintiff's father attributed the issue to confusion on Plaintiff's part); tr. 442, 441 (noting that Plaintiff had been taking the Paxil and propranolol incorrectly)).

"sometimes mentally confused" (*see id.*). He described Plaintiff's thought content as hopeless and his thought process as circumstantial and at times very disjointed and illogical (tr. 541). He noted Plaintiff's orientation to be normal (Dr. Conrad's description of Plaintiff's concentration is illegible) (*see id.*). Dr. Conrad indicated that Plaintiff had some restrictions regarding his immediate memory but no restrictions with respect to recent or remote memory, and he noted no hallucinations or perceptual disturbances (tr. 541). Dr. Conrad also noted that at times Plaintiff was confused and rambled but was usually appropriate, neatly dressed, and cooperative (*id.*). He listed Plaintiff's diagnosis as major depressive disorder, with a limited prognosis for improvement (*id.*). Lastly, Dr. Conrad noted that he had treated Plaintiff since 1992, and he opined that although Plaintiff would be able to manage his own benefits if such were awarded, Plaintiff would be "very unlikely" to sustain work activity for eight hours a day, five days per week, due to "inconsistency in his efforts and [illegible, but believed to state unreliable] or his ability to leave the house" (*see* tr. 542).

Dr. Conrad saw Plaintiff again on June 3, 2014, at which time Plaintiff reported that the lithium might have "evened out things a little bit" (tr. 575). Next, on July 16, 2014, Plaintiff returned and said he felt "okay" with the lithium, to the extent it seemed to cause no intolerable side effects, but Plaintiff was unsure of its effectiveness (tr. 625). Plaintiff reported having "bad days" half of the time, as well

as what he believed to be dystonia[7] (*id*.). Plaintiff also indicated symptoms such as an increased appetite, weight gain, fatigue/lethargy, disrupted sleep patterns, chronic pain, and muscle spasms (tr. 626). Dr. Conrad noted an anxious mood with a restricted affect, circumstantial thought processes, poor confidence, and ruminations, but that Plaintiff was alert and fully oriented, and his memory, insight, and judgment were intact (*id*.). Dr. Conrad found Plaintiff to have anxiety issues, and he indicated that Plaintiff was "virtually agoraphobic" (tr. 627). He assessed a Global Assessment of Functioning ("GAF") score of 50[8] (*id*.).

Plaintiff returned to Dr. Conrad on September 17, 2014 (tr. 629). He was upset because he had been denied Social Security benefits (*id*.). Dr. Conrad encouraged Plaintiff to find part-time work "and then to work with Vocational Rehabilitation as

---

[7] Dystonia is a disorder characterized by involuntary muscle contractions that cause slow repetitive movements or abnormal postures. *See* https://www.ninds.nih.gov/Disorders/ Patient-Caregiver-Education/Fact-Sheets/ Dystonias-Fact-Sheet (last visited October 11, 2018). It appears that Dr. Conrad knew of no medical basis or explanation for the dystonia, as he (and another physician) discussed with Plaintiff the possibility of a conversion disorder and/or conversion therapy (*see, e.g.*, tr. 625).

[8] Global assessment of functioning is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994). It may be expressed as a numerical score. *Id.* at 32. A score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*

well" (*id*.).   Otherwise, the treatment record is similar to the prior record (*see* tr.

629–30).

On October 22, 2014, Dr. Conrad indicated that Plaintiff was "virtually the

same" (tr. 633).   Plaintiff reported problems with anxiety, dizziness, insomnia, and

cognitive slowing due to his medications (tr. 634).   Dr. Conrad noted that Plaintiff had

not seen a therapist and stated:

> [Plaintiff] knows that I want him to see [Therapist] Carol Hicks [M.A.,
> L.M.F.T.] and he is very resistant to doing that.   He believes he is still
> having the dystonic reactions, even though he has not been on any kind
> of dopamine agent now for more than 6 months.   I did let him know that
> I did not recommend that he see a neurologist due to the fact that I am
> afraid that they would not take his complaints seriously and it would be
> more of a disappointment for him.

(tr. 633).   Dr. Conrad reiterated his belief that the dystonic symptoms were conversion

reactions, and he advised Plaintiff to commence therapy with Ms. Hicks (tr. 635).

Plaintiff's GAF score remained at 50 (*id*.), as it did throughout the remainder of Dr.

Conrad's treatment records.

At a follow-up appointment in November of 2014, Plaintiff reported "doing a

little better over the last couple of days," though he also reported fatigue/lethargy,

disrupted sleep, malaise, blurred or double vision, muscle stiffness, frequent

headaches, dizziness/vertigo, short-term memory problems, neuropathy, and tremors

(tr. 638).   Plaintiff was alert, oriented, and cooperative, with intact judgment, memory,

and insight (*id*.).  Plaintiff still had not seen Ms. Hicks, despite Dr. Conrad's urging (*see* tr. 637).

Plaintiff returned to Dr. Conrad on January 6, 2015 (tr. 641).  Plaintiff reported periods where he felt "unreal," whereby, if something happened he would become aware of it but then lose awareness of it (*id*.).  Dr. Conrad noted severe stress due to health concerns, and moderate stress due to family, friends, relationships, economic concerns, and occupational concerns (tr. 642).  Plaintiff still had not seen Ms. Hicks, so Dr. Conrad gave Plaintiff an ultimatum.  He told Plaintiff if he had not made a therapist's appointment by his next appointment with Dr. Conrad, Dr. Conrad would not schedule a follow-up appointment with Plaintiff (tr. 641, 643).

Plaintiff next saw Dr. Conrad on February 17, 2015 (tr. 645).  Plaintiff advised he had seen Ms. Hicks, and he complained that he was "sicker" than Dr. Conrad and others believed he was (*id*.).  Dr. Conrad indicated that Plaintiff "had a hard time putting together" the connection between his dissociations and previous history, and he noted that Plaintiff talked "about having some hopelessness and even suicidal thought at times" (*id*.).

At a visit in mid-March of 2015, Plaintiff advised Dr. Conrad he had recently been hospitalized due to a dystonic reaction, during which his body "seized up" and he could not relax his arms or legs (tr. 649).  Dr. Conrad advised Plaintiff he wanted

him to continue therapy with Ms. Hicks, noting he had only attended two sessions (*id*.). Dr. Conrad's impression was that Plaintiff remained unable to "process that the dystonic reactions have an emotional basis to them," and he was concerned that Plaintiff had not consistently attended therapy (tr. 651).

On April 15, 2015, Plaintiff advised Dr. Conrad he had been to an emergency room ("ER") twice since his last appointment, each time for what Plaintiff described as "dystonic reactions" (tr. 653). Dr. Conrad noted: "At this point I do not have too much more to offer, [as Plaintiff] is not at the point of accepting the possibility of a conversion disorder . . ." (*id*.). Dr. Conrad noted that he would refer Plaintiff for a neurological evaluation (*id*.).

On May 13, 2015, Plaintiff presented to Mohamed Sultan, M.D., for an evaluation of his dystonic symptoms (*see* tr. 678). A mental status examination revealed that Plaintiff was oriented to person, place, problem, and time; his mood, affect, and language were appropriate; his recent and remote memory were intact; and his fund of knowledge as to past history and current events was adequate (*see* tr. 679). A physical examination and review of systems revealed no findings to suggest dystonia (tr. 679–80), and Dr. Sultan noted that Plaintiff's description of the dystonic episodes was not typical (tr. 680). Dr. Sultan decided to refer Plaintiff for EEG and MRI testing, as well as labwork (*id*.).

When Plaintiff returned to Dr. Conrad on May 18, 2015, he stated he had seen Dr. Sultan and that EEG and MRI testing would be performed to evaluate Plaintiff's reported dystonic reactions and headaches (tr. 657).

The EEG was obtained on June 4, 2015, and no abnormalities were detected (*see* tr. 682). The brain MRI was also obtained on June 4, with the impression being "no significant abnormality identified" (tr. 684). Plaintiff returned to Dr. Sultan on June 10, 2015, for follow-up and to discuss the results of the recent EEG and MRI testing, as well as the labwork, which revealed some vitamin deficiencies (*see* tr. 675).

On July 6, 2015, Plaintiff advised Dr. Conrad he had obtained the EEG and MRI but did not yet know the results (tr. 661). Plaintiff also stated he was less worried about having another dystonic reaction (*id.*).

On August 18, 2015, Plaintiff returned to Dr. Conrad and stated he went to an ER once in July, due to a headache (tr. 665). Dr. Conrad surmised that many of Plaintiff's physical issues were anxiety related, such as his headaches and dystonia, the latter of which he had not experienced since he had begun treatment with Dr. Sultan (*id.*). Dr. Conrad recommended that Plaintiff perform volunteer work at least twice a week, believing that such would improve his symptoms and provide a necessary distraction (*see id.*).

On November 3, 2015, Dr. Conrad completed a questionnaire titled "Medical Opinion re: Ability to Do Work-Related Activities (Mental)" (tr. 669–70). The first section of the form relates to Plaintiff's abilities to perform unskilled work in sixteen functional areas (tr. 669). Dr. Conrad was given five options as to Plaintiff's ability in each area: (1) unlimited or very good; (2) limited but satisfactory; (3) seriously limited; (4) unable to meet competitive standards; and (5) no useful ability to function (*id.*). Dr. Conrad found Plaintiff to have limited but satisfactory abilities in three areas, to have serious limitations in three areas, and to be unable to meet competitive standards in the remaining ten areas (*id.*).[9] With respect to "mental abilities and aptitude needed to do particular types of jobs," Dr. Conrad found Plaintiff unlimited in his ability to adhere to basic standards of neatness and cleanliness, limited but satisfactory in his ability to travel in unfamiliar places, seriously limited in his ability to use public transportation, and unable to meet competitive standards in his abilities to interact appropriately with the general public and maintain socially appropriate behavior (tr. 670). Dr. Conrad opined that Plaintiff had such strong anxiety and depression that he would be unable to interact with others and maintain attention, and he noted frequent dystonic symptoms and headaches (*id.*). He additionally opined that

---

[9] On another section of the form, Dr. Conrad essentially found Plaintiff unable to perform skilled or semi-skilled work (*see* tr. 670).

Plaintiff's impairments and symptoms would cause him to be absent from work more than four days per month (*id*.).

Plaintiff returned to Dr. Conrad on November 19, 2015, and reported not "really getting away from home at all" (tr. 687). Dr. Conrad encouraged him to leave the house at least three times a week and to consider taking an artistic class or something similar at a local college (*id*.). A follow-up treatment record from late December of 2015 is essentially the same, with Dr. Conrad describing Plaintiff as "pretty much frozen where he is in time" (tr. 691). The last treatment record is dated March 2, 2016 (tr. 695). The record is not significantly different from prior records. It shows essentially no progress and/or Plaintiff not following Dr. Conrad's advice as far as occupying his mind with a class; it also reflects that Plaintiff did not appear willing to switch to a medication recommended by Dr. Conrad (*id*.).

On April 11, 2016, Carol Hicks completed a narrative summary regarding Plaintiff (tr. 864). Ms. Hicks noted she had seen Plaintiff upon referral from Dr. Conrad, and had seen him a total of eight times between February 4, 2015, and July 16, 2015 (*id*.). She reported that Plaintiff missed several scheduled appointments that he "forgot about or cancelled at the last minute due to illness" (*id*.). Ms. Hicks stated that Plaintiff relayed an extreme fear of other people in crowds or public situations and five serious attempts at suicide, as well as extremely poor self-image (tr. 864–65).

He also noted a history of chronic migraine headaches that began at age nine (*id*.).

Plaintiff stated he wanted to work, but reported he was unable to do so because he had

at least two debilitating migraines a week and, evidently, because he was "not

reliable" due to the combination of his degenerative disc disease, headaches, and

depression (tr. 865). Plaintiff claimed to have auditory hallucinations (i.e., hearing

whispers from his pillow) and stated he did not report them to Dr. Conrad because he

did not want to "sound crazy" (*id*.). Plaintiff stated he typically slept about three

hours per night and that he was most ambitious around midnight in his "mind time,"

though he claimed to have a deteriorating attention span (*id*.).

C.      Other Information Within Plaintiff's Claim File

At Plaintiff's hearing, held April 20, 2016, he testified he had to leave his last

job because there was so much pressure on him that he would have panic attacks

and/or migraine headaches (tr. 49–50). He stated he has had severe headaches since

he was nine years old, but they have worsened since 2007 (tr. 50). He noted that his

depression is like a roller coaster, and when he has bad days he has negative thoughts

and contemplates suicide every hour (tr. 51). On bad days he isolates himself from

absolutely everything and anything, even positive experiences (tr. 52). He also has

disc bulges at C5 and C6 which push into his nerve roots and cause shooting pain and

a pins-and-needles type sensation down into his shoulder, elbow, and fingers (*id*.).

Plaintiff stated he attempted to play soccer upon Dr. Conrad's advice, but it was not enjoyable and hurt his back (tr. 54). Plaintiff noted he no longer takes lithium because it might have increased his dsythymia or the type of dystonic reaction he had when he took Paxil (tr. 57). He also noted that his current medications make him tired and, at times, confused (tr. 55–56). He reported experiencing auditory hallucinations to the extent that he hears voices that are not there when he is in the shower or resting in a quiet room (tr. 54–55).

Plaintiff testified that he avoids situations like grocery shopping or going out to dinner because it will either stress him out to the point of a panic attack or give him a headache (tr. 59). He only drives when it is necessary, and he stays at his parents' house when his wife is not home because he fears having a dystonic reaction while being alone (tr. 60, 63–64). Plaintiff has two to four migraine headaches per week, and he knows of no triggers (tr. 66). He rated his pain at a two on a good day, at a five or six on a typical day, and at a nine on a bad day (tr. 68). He estimated he could perform a task for thirty to forty-five minutes before needing to take a break for the rest of the day (tr. 70).

A vocational expert ("VE") testified at Plaintiff's hearing. In summary, the VE characterized all of Plaintiff's past relevant work (i.e., as a telemarketer, police aid, skip trace, and insurance claims clerk) as sedentary, semi-skilled jobs (tr. 74–76). The

VE then testified that a hypothetical person with Plaintiff's RFC could not perform his past relevant work, largely due to the fact that the prior work required more interaction with the public than Plaintiff's RFC permits (tr. 77–78). The person could, however, perform other available work such as mailroom clerk, poultry dresser, and maid, all of which are unskilled jobs that are performed at the light level of exertion and otherwise accommodate Plaintiff's RFC (*see id.*). If, however, the person would be off task for 20% of the workday, or if the person would miss four days of work per month, all work would be precluded (tr. 78).

V.    DISCUSSION

Plaintiff contends the ALJ erred in determining his RFC because he improperly discounted the opinions of Dr. Conrad, Plaintiff's treating psychiatrist, and relied instead on the opinions of non-examining medical sources; and erred in failing "to account for Plaintiff's GAF scores, which showed a consistent level of mental impairment throughout the treatment record" (ECF No. 16 at 1, 11).

A.    Opinions of Dr. Conrad

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla.

1996); 20 C.F.R. § 404.1527(c). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See* Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

However, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(c)(2).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical issues at

issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the province of the Commissioner. 20 C.F.R. § 404.1527(d).

Here, the ALJ acknowledged that Dr. Conrad was Plaintiff's long-term treating psychiatrist, exceptionally long term, in that the treating relationship dates back to 1992 (*see* tr. 30). The ALJ then assigned little weight to Dr. Conrad's opinion that Plaintiff is "unable to maintain a normal workweek" (tr. 32). Although the ALJ did not pinpoint the location of the opinion he was discounting, or quote it verbatim, the opinion—or one similar to it—was offered by Dr. Conrad multiple times. For

example, on May 14, 2014, Dr. Conrad completed the first questionnaire and when asked whether Plaintiff could sustain work activity for eight hours a day, five days a week, Dr. Conrad responded: "Very unlikely, inconsistent in his efforts and unreliable or his ability to leave the house" (tr. 542). Then, in November of 2015, Dr. Conrad opined on a second questionnaire that Plaintiff would be "unable to meet competitive standards" with regard to his ability to "maintain regular attendance and be punctual within customary, usually strict tolerances" or to "complete a normal workday and workweek without interruptions from psychologically based symptoms" (tr. 669). Dr. Conrad additionally opined in November of 2015 that Plaintiff's impairments or treatment would cause him to miss work more than four times per month (the most extreme option offered (other options included missing work none, one, two, three, or four days per month)) (*see* tr. 670).

In explaining why he assigned little weight to the opinion of Dr. Conrad that Plaintiff would be "unable to maintain a normal workweek," the ALJ stated:

> The longitudinal treatment history does not show that the claimant has an inability to leave the house. [Plaintiff] testified and his father wrote in his Report that [Plaintiff] is able to shop in stores, attend his medical and psychiatric treatment appointments, and recently got married. His clinical exams do not reveal disabling symptomatology. Dr. Conrad's own treatment notes the same day of the earlier report reflect that Lithium taken by [Plaintiff] seems to be evening his mood out and helping his psychiatric symptoms (Exhibit B13F [tr. 574–77]). His later clinical examination notes show his mental status to be anxious but otherwise within normal limits in each category throughout late 2014 and

2015—this includes his attention, concentration, and behavior (Exhibit B17F [tr. 625–68]).

(tr. 32–33).

The undersigned cannot find that the ALJ's reasons for rejecting Dr. Conrad's opinion(s) are supported by substantial evidence on the record as a whole. First, with respect to the Report submitted by Plaintiff's father, a review of the entire statement shows that in the father's opinion Plaintiff was very limited with respect to his ability to leave the house and thus that the father's opinion was *consistent* with the opinions of Dr. Conrad. For example, the father reported that Plaintiff goes outside only once a day and that when he goes out and interacts with others he "creates conflicts" (tr. 293). Although the father did report that Plaintiff shops, as the ALJ stated in rejecting Dr. Conrad's opinion(s), the father noted that this occurred only about once a week, that sometimes it was by computer, and that it took Plaintiff longer to shop than it should (tr. 293). The father explained that Plaintiff spends almost all of his time on the computer or watching television, noting that "it's all he does" (tr. 294). Additionally, the father reported that Plaintiff does not spend time with others, goes nowhere (such as church) on a regular basis, and needs to be reminded to keep doctors' appointments (*id*.). Lastly, the father stated that Plaintiff does not get along with authority figures such as bosses and that he has been fired due to an inability to get along with other people (tr. 296). Thus, although the father "technically" stated

that Plaintiff could shop and attend appointments, when those statements are read in context it is clear that they do not undermine Dr. Conrad's opinion that Plaintiff would be unable to consistently attend full-time employment. The same holds true for Plaintiff's testimony, as it largely mirrors his father's reports regarding limited social outings and daily activities.[10]

Additionally, the court fails to see how Plaintiff's recent marriage undermines the opinions of Dr. Conrad. The record shows Plaintiff met his wife online (*see* tr. 865), which is consistent with his father's report that he generally spends all of his time indoors on a computer (or watching tv). The record also shows that even though Plaintiff is married he still spends a substantial amount of time at his parents' house or at his own home, not socializing, volunteering, or otherwise engaging in activities outside the home, despite being married.

Continuing, the ALJ stated that Dr. Conrad's own treatment notes recorded the same day he completed the first questionnaire reflect that the lithium was evening out Plaintiff's mood and helping his psychiatric symptoms. Dr. Conrad completed the

---

[10] It is worth noting that elsewhere in the ALJ's opinion he discredited the opinions of Plaintiff's father regarding Plaintiff's "extreme isolation and social limitations" (*see* tr. 29). It thus appears that the ALJ viewed the opinions of Plaintiff's father both as indicating that Plaintiff was able to go out and about in the world with ease (when discrediting the opinions of *Dr. Conrad*), but also as indicating that Plaintiff was extremely isolated and socially withdrawn (when discrediting opinions of *the father* that mirrored Plaintiff's subjective complaints in this regard (*id.*)). The ALJ's view of the evidence thus appears internally inconsistent on a matter critical to this case.

first questionnaire on May 14, 2014 (tr. 540), but the treatment notes referenced by the ALJ regarding the lithium were made on June 3, 2014 (tr. 575), three weeks <u>after</u> the first questionnaire was completed. Thus, the ALJ's implication that the earlier opinions are inconsistent with treatment records of the same day is not supported by the record. It is true that a treatment record of May 5, 2014, reflects a report by Plaintiff that "he thinks the lithium has helped a bit," but this is hardly a definitive statement regarding the efficacy of that medication, especially considering that Plaintiff reported in July of 2014 that he was not sure that the lithium had actually helped him (tr. 625), and in September of 2014 that he could not tolerate the dose of lithium he had been prescribed (tr. 629). More generally, Dr. Conrad's longitudinal records show the overall ineffectiveness of Plaintiff's medications, despite repeated adjustments to those medications, as well as an overall impression of Dr. Conrad that Plaintiff was "frozen" in his progress and had a limited prognosis for improvement.

Finally, the ALJ's last reason for discrediting Dr. Conrad's opinions is only partially supported by the record. This reason relates to Dr. Conrad's later treatment records, which the ALJ referred to in block and characterized as showing Plaintiff's "mental status to be anxious but otherwise within normal limits in each category throughout late 2014 and 2015—this includes his attention, concentration, and behavior (Exhibit B17F [a 43-page exhibit])." The records referenced by the ALJ

cover slightly more than one year of treatment, from about mid-July of 2014 through mid-August of 2015. The ALJ was correct in noting that at each office visit, which occurred approximately monthly, Plaintiff was generally noted to be anxious but within normal limits with respect to attention, concentration, and behavior (*see, e.g.*, tr. 626, 630, 634, 642–43, 646–47, 650, 654, 658, 662, 666). But the ALJ's characterization overlooks that Dr. Conrad *also* noted at each visit that Plaintiff's affect was restricted; his thought processes were circumstantial; and his thought content reflected poor confidence, poor esteem, and ruminations (*id*.). It also overlooks the consistent assessment of GAF scores of 50, which correspond to a belief by Dr. Conrad that Plaintiff suffered from serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job) (*id*.). Lastly, the ALJ's characterization ignores the narrative sections of these treatment records which, as summarized above, show that Plaintiff was not functioning at a level consistent with an ability to perform full-time work. For example, Plaintiff reported having bad days half the time (tr. 625). And Dr. Conrad opined that Plaintiff appeared to be "virtually agoraphobic" (tr. 627), that Plaintiff was "virtually the same" (i.e., not improving) (tr. 634), and that Plaintiff's anxiety was so severe it was causing physical problems (*see, e.g.*, tr. 665).

Although the foregoing discussion is sufficient to demonstrate that the ALJ failed to articulate good cause for rejecting the opinions of Dr. Conrad, a few additional points bear mention. Dr. Conrad treated Plaintiff for *more than twenty years* before he rendered the opinions rejected by the ALJ.[11] This exceptionally long treating relationship sets Dr. Conrad apart from other, more-typical treating physicians, and it adds significant weight to the opinions he expressed. *See, e.g.*, Lannon v. Comm'r, 234 F. Supp. 3d 951, 956 (D. Ariz. 2017) ("Dr. Kelly has been treating Plaintiff for more than 20 years. [] This longtime treating relationship "provides a 'unique perspective' on [Plaintiff's] condition," and the nature and extent of the relationship "adds significant weight to [Dr. Kelly's] opinions.") (quoting Orn v. Astrue, 495 F.3d 625, 633 (9th Cir. 2007) (quoting § 404.1527(c)(2)(i)–(ii))).

Furthermore, the undersigned finds that the opinions of Dr. Conrad regarding Plaintiff's inability to maintain a normal workweek are consistent with his treatment records. For example, in addition to consistently assessing GAF scores of no greater than 50,[12] Dr. Conrad repeatedly recommended that Plaintiff attempt to leave the

---

[11] The undersigned can recall no case over which she has presided involving a treating relationship of that duration, by a specialist no less.

[12] Dr. Curtis, on the other hand, assessed GAF scores of only 30 (*see* tr. 367, 372). A GAF score between 21 and 30 reflects behavior that is considerably influenced by delusions or hallucinations OR serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends). American Psychiatric Association, Diagnostic

house only a few times a week (e.g., by volunteering *twice a week*, by leaving the house *three times a week*, by finding a *part-time* job, or by taking *a* class). Dr. Conrad never recommended or encouraged Plaintiff to find a full-time job, take full-time college courses, or otherwise engage in any activity consistent with a forty-hour workweek. It is clear from the treatment records that Dr. Conrad did not believe Plaintiff to be capable of such full-time, continuous activity. It is equally clear from the records that even when Plaintiff took his medications as directed they did not provide adequate control, that the medications were in regular need of adjustment, that at times Plaintiff was confused or forgetful with respect to his medications, that Dr. Conrad did not expect Plaintiff to improve, and that Plaintiff did not improve during the relevant period or certainly did not improve for any significant length of time, such that he could consistently maintain a normal workweek and schedule.

For all of the above reasons, the undersigned finds that the decision of the ALJ is not supported by substantial evidence in the record as a whole and cannot be affirmed.

B.      Relief

In Social Security cases, the role of this court is not to find facts but to determine whether the law has been properly applied and whether substantial evidence

_____

and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994).

supports the Commissioner's findings. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); Foote, 67 F.3d at 1562 (stating that an insufficient credibility finding is "a ground for remand when credibility is critical to the outcome of the case") (emphasis added); Salter v. Astrue, Case No. 3:08cv189/RV/EMT (N.D. Fla. May 22, 2009 (ECF No. 15)) (same). A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis, 985 F.2d at 534; *see also* Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); Carnes v. Sullivan, 936 F.2d at 1219 ("The record . . . is fully developed and there is no need to remand for additional evidence.").

Accepting Dr. Conrad's opinions as true, MacGregor, 786 F.2d at 1053 ("Where the Secretary has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true."), the VE has

testified that Plaintiff could perform no available work.[13]  This court thus finds that the evidence conclusively establishes that Plaintiff was disabled during the relevant period (from March 24, 2014, through July 7, 2016 (*see* footnote 2, *supra*)). Therefore, this case should be remanded to the Commissioner only for a calculation of an award of benefits.  *See* MacGregor, 786 F.2d at 1054–55; *see also, e.g.*, Geiger v. Apfel, No. 6:99-cv-12-Orl-18D, 2000 WL 381920 (M.D. Fla. Feb. 9, 2000).

Accordingly, it is hereby **ORDERED**:

1.     That the Commissioner is directed to remand this case to the Commissioner, solely for a calculation and award of SSI benefits.

2.     That **JUDGMENT** is entered, pursuant to sentence four of 42 U.S.C. § 405(g), **REVERSING** the Commissioner's decision and **REMANDING** this case for an award of benefits.

3.     That the Clerk is directed to close the file.

At Pensacola, Florida this 5th day of November 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

---

[13] As previously noted, the VE testified that if the person would miss four days of work per month (Dr. Conrad noted Plaintiff would miss at least four days of work per month), or if a person would be off task for 20% of the workday, all work would be precluded.

Case No.: 3:17cv452/EMT